ELLEN GAMMON,                          )
                                       )
        Plaintiff,                     )
    v.                                 )        1:09-cv-00236-JAW
                                       )
CRISIS AND COUNSELING                  )
CENTERS, INC.,                         )
                                       )
        Defendant.                     )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

The Court concludes that a former employee of a mental health services company produced sufficient evidence to generate genuine issues of material fact as to whether the Defendant violated the Maine Whistleblower Protection Act (MWPA) by taking an adverse employment action against her in retaliation for her protected activity. Accordingly, the Court denies the Defendant's motion for summary judgment.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On June 9, 2009, Ellen Gammon filed a complaint against her former employer, Crisis and Counseling Centers, Inc. (Crisis & Counseling), alleging a violation of the MWPA, 26 M.R.S. § 831 et. seq.[1] *Compl.* ¶ 1 (Docket # 1). On July 28, 2010, Crisis & Counseling moved for summary judgment. *Def. Crisis and*

---

[1] Ms. Gammon's Complaint against Crisis & Counseling initially alleged a violation of the Maine Human Rights Act (MHRA), Title VII, the Age Discrimination in Employment Act (ADEA), the federal and state Equal Pay Acts, and the MWPA, 26 M.R.S. § 831 et. seq. *Compl.* ¶ 1 (Docket # 1). On June 10, 2010, the parties stipulated to the dismissal of all but Ms. Gammon's MWPA claim. *Stipulation of Dismissal as to Counts II, III, IV and Part of Count I of Pl.'s Compl.* (Docket # 24).

Counseling Center's *Mot. for Summ. J.* (Docket # 28) (*Def.'s Mot.*). On August 23, 2010, Ms. Gammon responded to Crisis & Counseling's motion for summary judgment. *Pl.'s Resp. in Opp'n. to Def.'s Mot. for Summ. J.* (Docket # 38) (*Pl.'s Resp.*). On September 10, 2010, Crisis & Counseling replied to Ms. Gammon's response. *Def.'s Reply Mem. in Supp. of Mot. for Summ. J.* (Docket # 45) (*Def.'s Reply*).

### B. Quibbles

The parties raised a number of issues regarding the facts the Court should consider for summary judgment purposes.

### 1. District of Maine Local Rule 56(b)

Ms. Gammon requests that the Court strike a number of paragraphs in Crisis & Counseling's statement of material facts on the ground that they contain more than one alleged fact in violation of the District's Local Rule 56(b). *Pl.'s Resp. to Def.'s Statement of Material Facts* ¶¶ 1, 10, 11, 14-16, 23, 24, 27, 28, 31-35, 38, 48 (Docket # 39) (PRDSMF). The Court has previously explained that Local Rule 56(b) does not require that each paragraph include only a single assertion. D. ME. LOC. R. 56(b); *Randall v. Potter*, 366 F. Supp. 2d 120, 122 (D. Me. 2005); *Capozza Tile Co., Inc. v. Joy*, 223 F. Supp. 2d 307, 313 n.2 (D. Me. 2002). Furthermore, "conducting an intensive line-by-line review of [the alleged] violations of Local Rule 56 would do little to assist the court in achieving the goals of this local rule or resolving the merits of the pending [motion]." *Burchill v. Unum Life Ins. Co. of Am.*, 327 F. Supp. 2d 41, 43 (D. Me. 2004). The Court denies Ms. Gammon's request to strike.

## 2.    Ms. Gammon's Post-Deposition Affidavit

Crisis & Counseling argues that the Court cannot consider any of Ms. Gammon's statements of fact that rely on her post-deposition affidavit. *Def.'s Reply* at 1. It argues that the affidavit "contradicts her own deposition testimony" and "attempts to create the appearance of triable issues of fact." *Id.*

Crisis & Counseling is correct that "[w]hen an interested witness has given clear answers to unambiguous questions, [s]he cannot create conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). However, that rule does not bar all statements in a post-deposition affidavit. "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment."[2] *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002).

---

[2] Crisis & Counseling "unnecessarily made the Court's job more difficult." *Eaton v. Hancock Cnty*, No. CV-08-370-B-W, 2010 U.S .Dist. LEXIS, 102967, at *10 n.7 (D. Me. Sept. 28, 2010). Each time Ms. Gammon's statement of material fact cited her affidavit, Crisis & Counseling responded: "Plaintiff cannot use a subsequent affidavit to contradict the statements and admissions made in her deposition." *Def.'s Resp. to Pl.'s Statement of Additional Material Facts* ¶¶ 21, 24, 25, 27, 32, 41, 47 (Docket # 44) (DRPSAMF). However, instead of citing Ms. Gammon's deposition, Crisis & Counseling cited its own statements of material fact. *Id.* Most of Crisis & Counseling's statements of fact are denied or qualified by Ms. Gammon. To determine whether specific statements in Ms. Gammon's affidavit contradicted her deposition, the Court was required to compare both the deposition testimony cited in Crisis & Counseling's statements of fact and the deposition testimony cited in Ms. Gammon's corresponding denials and qualifications with Ms. Gammon's post-deposition affidavit. This arduous exercise frustrated the expeditious disposition of Crisis & Counseling's motion.

Crisis & Counseling's first request to strike on this ground responds to paragraph twenty-one of Ms. Gammon's Statement of Additional Material Facts. DRPSAMF ¶ 21; *Pl.'s Statement of Additional Material Facts* ¶ 21 (Docket # 40) (PSAMF). Paragraph twenty-one asserts that Ms. Gammon went online to confirm that Crisis & Counseling's billing practices were illegal and cites websites she says confirmed her belief. PSAMF ¶ 21. Consistent with this statement, Ms. Gammon testified in her deposition that she went online at the office and found something to suggest that Crisis & Counseling's billing practices violated licensing rules. *Def. Crisis & Counseling Center's Statement of Material Fact in Support of its Mot. for Summ. J.* (Docket # 29) (DSMF) at Attach. 1 (*Gammon Dep.*) at 169:16-25. However, Ms. Gammon also stated that she could not remember where she found this information. *Gammon Dep.* at 170:2-5. In her affidavit, Ms. Gammon mentions specific websites she says confirmed that the Maine law and regulation required transportation to be billed separately from assessments. *Aff. of Ellen Gammon* ¶ 5 (Docket # 41) (*Gammon Aff.*). She thus recalled in her affidavit what she could not recall during her deposition. To fully comply with *Colantuoni*, Ms. Gammon should have explained why her memory was refreshed, but it seems apparent that she later located the government websites she could not immediately recall at the deposition. Since the inference is obvious and since the import of the statement is not the truth of the content of the website, but whether Ms. Gammon had a reason for believing Crisis & Counseling was acting inappropriately, paragraph twenty-one amplifies her deposition testimony. The Court will not

disregard it. The Court denies Crisis & Counseling's request to strike paragraph twenty-one.

Crisis & Counseling also requests to strike Ms. Gammon's statement that she complained about billing practices to her team leader, Christy Labonte. DRPSAMF ¶ 24; PSAMF ¶ 24. Most of the deposition testimony Crisis & Counseling claims is contradicted by her affidavit deals with whether Ms. Gammon had sufficient knowledge of billing practices to make a complaint, not whether she made a complaint at all. The only testimony Crisis & Counseling cites that could be conceivably construed as contradicting her assertion that she complained to Ms. Labonte is testimony that Ms. Gammon sought clarification about the law because she was not positive whether the billing practices were illegal. DSMF ¶¶ 47 (citing *Gammon Dep.* 166:9-13, 168:18-20, 170:6-7, 177:22-25, 178:1). Asking for clarification at one time does not rule out making a complaint at another, and unfamiliarity with a law does not rule out a valid suspicion of its violation. Furthermore, Ms. Gammon explicitly said in her deposition that she spoke with Christy Labonte about the billing practices. *Gammon Dep.* 170:8-10. Crisis & Counseling cites nothing to clarify the nature of this conversation. The Court denies Crisis & Counseling's request to strike paragraph twenty-four of Ms. Gammon's statement of additional facts.

Next, Crisis & Counseling seeks to strike Ms. Gammon's statement that she complained about billing for travel time within weeks of her termination. DRPSAMF ¶ 25; PSAMF ¶ 25. Again, her affidavit is more specific than her

deposition testimony. Crisis & Counseling cites deposition testimony in which Ms. Gammon says that she could not recall exactly when she spoke with her supervisor, Don Williams, or her team leader, Christy Labonte. DSMF ¶¶ 39, 47 (citing *Gammon Dep.* 169:4-13, 170:11-14). In her affidavit, however, she states that she "made the above complaints about billing for travel time up to within weeks of my termination." *Gammon Aff.* ¶ 5. Ms. Gammon's inability at her deposition to recall the timing of two specific conversations does not directly contradict her later general statement that she complained about billing for travel time within weeks of her termination.[3] The Court denies Crisis & Counseling's request to strike paragraph twenty-five of Ms. Gammon's statement of additional material facts.

Crisis & Counseling also seeks to strike Ms. Gammon's statement that, based on her training and experience, she understood it to be fraud to charge for an assessment when a client refused to be assessed and an assessment was not done. DRPSAMF ¶ 27; PSAMF ¶ 27. Ms. Gammon said both in her deposition and in her affidavit that she understood this billing practice to be fraud. *Gammon Dep.* 171:7-13; *Gammon Aff.* ¶ 6. Crisis & Counseling fails to direct the Court to any contradiction between that deposition testimony and her affidavit. The Court denies Crisis & Counseling's request to strike paragraph twenty-seven of Ms. Gammon's statement of additional material facts.

---

[3] Crisis & Counseling complains that Ms. Gammon's later recall renders her affidavit suspect. *Def.'s Mot.* at 23. If so, it goes to the weight of her statement, not its admissibility for purposes of the pending motion for summary judgment. Ms. Gammon's later recall may be grist for the cross-examination mill at trial but at this stage, the Court must view the record in the light most favorable to Ms. Gammon.

Crisis & Counseling objects to Ms. Gammon's statement that she complained about the company charging for crisis follow-up when no crisis follow-up occurred. DRPSAMF ¶ 32; PSAMF ¶ 32. Again, Crisis & Counseling fails to direct the Court to any contradiction. Instead, it cites testimony that Ms. Gammon did not know what was on the final bills that Crisis & Counseling sent out to its clients, attempting to undercut Ms. Gammon's foundation for making a complaint. DRPSAMF ¶ 32 (citing DSMF ¶¶ 44-47). Ms. Gammon's ignorance of the specific contents of client bills does not contradict her contention that she complained about the company charging for crisis follow-up when no follow-up occurred. The Court denies Crisis & Counseling's request to strike paragraph thirty-two of Ms. Gammon's statement of additional material facts.

Crisis & Counseling also seeks to strike Ms. Gammon's statement that she complained to Don Williams about the company's failure to follow a certain safety practice within the last six months of her employment. DRPSAMF ¶ 41; PSAMF ¶ 41. Crisis & Counseling cites nothing in the record to support that there is a contradiction between the deposition testimony and affidavit. The Court denies this request to strike.

Finally, Crisis & Counseling seeks to strike Ms. Gammon's statement that during the monthly group supervision meetings up to the time of her termination, Ms. Gammon complained to her team leaders, including Mr. Williams, about the billing and safety issues. DRPSAMF ¶ 47; PSAMF ¶ 47. Specifically, Crisis & Counseling objects to the assertion that she made such a complaint "up to the time

7

of her termination". DRPSAMF ¶ 47. It cites a great deal of deposition testimony in which Ms. Gammon is unable to remember the dates of her specific complaints. *See* DSMF ¶¶ 47, 48. At the same time, Crisis & Counseling acknowledges that Ms. Gammon stated in her deposition that she made complaints within the last six months of her employment. DRPSAMF ¶¶ 47. Stating that something occurred within one month does not contradict with stating that it occurred within six months. The Court denies Crisis & Counseling's request to strike paragraph forty-seven of Ms. Gammon's statement of additional material facts.

### 3. Requests for Admission

On April 1, 2010, Crisis & Counseling served Ms. Gammon with a set of seventeen requests for admission. *Decl. of Sally Morris in Support of Crisis & Counseling Centers. Inc.'s Mot. for Summ. J.* (Docket # 32) (*Morris Decl.*) at Ex. 1, *Def.'s First Set of Requests for Admission* (*Requests for Admission*). According to Attorney Sally Morris' Declaration, Ms. Gammon had failed to respond to the requests for admission as of late July 2010. *Morris Decl.* ¶ 4. Specifically, citing the unanswered Requests for Admission, Crisis & Counseling says that Ms. Gammon admitted:

> On June 12, 2007, [Ms.] Gammon left her shift at Crisis & Counseling after meeting with her Team Leader about a corrective action plan. When [Ms.] Gammon left work on June 12, she cleaned out her locker and left the workplace with all her belongings. At that time, [Ms] Gammon did not intend to return to work at Crisis & Counseling again. Don Williams, [Ms.] Gammon's team leader, did not tell [Ms.] Gammon on or before June 12, 2007, that her employment with Crisis & Counseling was terminated. No Supervisor or Administrator at Crisis &

> Counseling told [Ms.] Gammon on or before June 12, 2007, that her employment with Crisis & Counseling was terminated. [Ms.] Gammon did not report to work any shift with Crisis & Counseling after June 12, 2007. No Supervisor or Administrator at Crisis & Counseling told [Ms.] Gammon, at any time, that she was being targeted for termination because she was a trouble maker. [Ms.] Gammon never complained to any Supervisor or Administrator at Crisis & Counseling, at any time, that she felt like she was being targeted for termination because she was a trouble maker. The only notice [Ms.] Gammon received from Crisis & Counseling indicating that her employment was terminated was in the letter from Esther Tuttle to [Ms.] Gammon dated June 27, 2007.

*Def.'s Reply* at 3. In its Reply, Crisis & Counseling argues that by failing to respond to the Requests for Admission, Ms. Gammon admitted she voluntarily left employment and in effect that she has no case. *Def.'s Reply* at 2-3.

Because of the way Crisis & Counseling raised this question, the Court can only surmise Ms. Gammon's response. In its motion for summary judgment, Crisis & Counseling posited the unanswered Requests for Admission as authority for some of its Statements of Material Fact. DSMF ¶¶ 28-31. In her response, Ms. Gammon treated the Statements of Material Fact based on the unanswered Requests for Admission as if the facts were not deemed admitted, denying some, qualifying her response to others, and admitting some. PRDSMF ¶¶ 28-31. But Crisis & Counseling did not argue the preclusive effect of the admissions until its Reply, and as there is no provision for a sur-reply, Ms. Gammon has never been heard as to why she failed to respond to the Requests for Admission or why the Court should not treat the facts as admitted.

A careful review, however, leads to the conclusion that the Requests for Admission, even if deemed admitted, do not change the outcome of this motion. First, the breadth of the admissions that Crisis & Counseling would like to apply to Ms. Gammon substantially exceeds the facts in its Statement of Material Facts based on the Requests for Admission. Thus, for example, Crisis & Counseling says that Ms. Gammon has admitted that "[n]o Supervisor or Administrator at Crisis & Counseling told [Ms.] Gammon, at any time, that she was being targeted for termination because she was a trouble maker." *Def.'s Reply* at 3. But even though these statements appear in its Requests for Admission, they do not appear in its Statements of Material Fact. The Court will not consider discovery responses that have not been properly placed before the Court in accordance with Local Rule 56(c). D. ME. LOC. R. 56(c).

Crisis & Counseling has placed just a few Statements of Material Fact before the Court that are based on its unanswered Requests for Admission:

> 28.    In addition, when [Ms.] Gammon left work on June 12, 2007, she cleaned out her locker and removed her belongings from the workplace.
> 29.    When [Ms.] Gammon left work on June 12, 2007, she had no intention of returning to work.
> 30.    After she left work on June 12, 2007, [Ms.] Gammon in fact never returned to work at Crisis & Counseling Centers.
> 31.    At no point prior to June 12, 2007, when [Ms.] Gammon voluntarily left work, had any Supervisor or Administrator at Crisis & Counseling informed [Ms.] Gammon that her employment was terminated.

DSMF ¶¶ 28-31 (citations omitted). In her response, Ms. Gammon attempted to deny paragraph 28 and a portion of paragraph 31 and effectively admitted paragraphs 29, 30, and the rest of paragraph 31.[4]

Crisis & Counseling assumes that Ms. Gammon is held to have admitted that she "voluntarily left work" on June 12, 2007. But nowhere in its Requests for Admission did Crisis & Counseling ask Ms. Gammon to admit that she "voluntarily left work" on June 12, 2007. Crisis & Counseling cites Request for Admission 5 as support for its assertion that Ms. Gammon "voluntarily left work," but Request for Admission 5 reads:

> No Supervisor or Administrator told you on or before June 12, 2007 that your employment with CCC was terminated.

*Requests for Admission* ¶ 5. Since Request for Admission 5 does not directly support Crisis & Counseling's contention that Ms. Gammon "voluntarily left work" on June 12, 2007, Ms. Gammon was free to deny that aspect of Statement of Material Fact paragraph 28.

The admissions properly before the Court for purposes of this motion do not change the result because regardless of the admissions, Ms. Gammon has placed sufficient facts before the Court to generate genuine issues of material fact. Ms. Gammon says that when she met with Mr. Williams on June 12, 2007, he placed her on a corrective action plan, which consisted of indefinite probation and

---

[4] In response to paragraph 28, Ms. Gammon denied that she "immediately left work or said that she would not [return?]." PRDSMF ¶ 28. In response to paragraph 31, she denied that she voluntarily left work on June 12, 2007. *Id.* ¶ 31.

prohibited her from complaining to any team leaders and from asking questions or she would be fired. *Pl.'s Resp.* at 7. Ms. Gammon says that because she became upset, Mr. Williams "told her to go home while he would try to figure out what was going on." *Id.* at 8. She claims that when she called him the next day, Mr. Williams informed her that "the action plan was off the table. Management wanted Gammon gone, and the company would be offering her a severance package." *Id.*

Ms. Gammon has effectively denied that she voluntarily left work on June 12, 2007 and she says Crisis & Counseling fired her the very next day. Even if she is held to admit that she cleaned out her locker and left the workplace on June 12 with all her belongings without any intention of returning, whether Crisis & Counseling fired her on June 13 remains a question of fact, which the Court must view in the light most favorable to Ms. Gammon.[5]

### C. The Dispute[6]

Crisis & Counseling is a non-profit agency that provides counseling services, crisis interventions, substance abuse counseling, and related educational services for clients and families at its residential and outpatient crisis facilities. DSMF ¶ 1;

---

[5] Ms. Gammon could of course have avoided this entire discussion simply by filing a timely response to Crisis & Counseling's Requests for Admission. Inaction in the face of Rule 36 requests for admission is a risky strategy. What impact Ms. Gammon's failure to respond will have on the rest of the case remains unclear. Rule 36(b) allows a party to move the Court to permit the admission to be withdrawn or amended if "it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." FED. R. CIV. P. 36(b). But Ms. Gammon has filed no Rule 36(b) motion in this case.

[6] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Ms. Gammon's theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). Consistent with this obligation, the Court recites certain events as facts even though Crisis & Counseling disputes them.

PRDSMF ¶ 1.  Ms. Gammon worked for Crisis & Counseling as a crisis worker from November 1998 until June 2007.  PSAMF ¶ 3; DRPSAMF ¶ 3.  In 2004, Ms. Gammon began to work in Crisis & Counseling's mobile crisis unit.  DSMF ¶ 14; PRDSMF ¶ 14; PSAMF ¶ 4; DRPSAMF ¶ 4.

The mobile crisis unit provides twenty-four-hour telephone and walk-in counseling services as well as off-site mental health assessments and evaluations, which often occur in the client's home.  DSMF ¶ 3; PRDSMF ¶ 3.  Off-site and in-home assessments are necessary to fulfill Crisis & Counseling's objective to provide the least intrusive means possible to de-escalate a client in crisis.  DSAMF ¶ 3; PRDSMF ¶ 3.  Clients receive services when they are experiencing mental health crises, during which time many clients are also abusing substances.  DSMF ¶ 4; PRDSMF ¶ 4.  Because the needs of its clients change frequently, each presentation to Crisis & Counseling requires an "individualized and clinical assessment of how to serve [the] client."  DSMF ¶ 5; PRDSMF ¶ 5.  Some clients with very serious or violent histories may present mildly for a particular assessment and may need only minor help accessing services in the community.  DSMF ¶ 6; PRDSMF ¶ 6.  Before sending workers to an in-home assessment, crisis workers conduct a verbal screening of the client to determine whether the client has consumed any substances, has any weapons in the home, or has the potential for violence, as well as other safety factors.  DSMF ¶ 8; PRDSMF ¶ 8.

Pursuant to its policy on "Individual Protocols," Crisis & Counseling uses "Green Sheets" as a repository of information about the individual or special needs

13

of clients.  DSMF ¶ 10; PRDSMF ¶ 10.  Information covered in Green Sheets may include contact parameters for high users of crisis services and clients with special or acute needs, diagnostic information, or actions that may make a crisis worse for a particular client.  DSMF ¶ 10; PRDSMF ¶ 10.  Green Sheets are not meant to be irrevocable rules for contact with a particular client, and they are to be reviewed regularly to assess their effectiveness and to consider the need for modifications given the circumstances of the particular client.  DSMF ¶ 11; PRDSMF ¶ 11.

Ms. Gammon's job as a crisis worker required her to evaluate clients, speak to them about their needs, and formulate a plan to best meet those needs.  PSAMF ¶ 7; DRPSAMF ¶ 7.  Like other crisis workers, she was required to consult with Team Leaders or Clinical Supervisors to determine the best way to assess a client. DSMF ¶ 12; PRDSMF ¶ 12.  She was also responsible for keeping an accurate account of her time spent with the individuals in crisis and filling out billing statements.  PSAMF ¶ 5; DRPSAMF ¶ 5; PSAMF ¶ 9; DRPSAMF ¶ 9.[7] Part of her responsibilities with regard to billing included filling out insurance and authorization forms and keeping a detailed account of her interactions with clients. PSAMF ¶ 8; DRPSAMF ¶ 8.[8]

---

[7] In its denial of these statements, Crisis & Counseling merely states that Ms. Gammon was not responsible for sending out billing statements and did not know what the agency charged on its bills. That is non-responsive to whether she kept account of her time and recorded that time on billing statements.  The Court recounts Ms. Gammon's version as the non-moving party.

[8] Crisis & Counseling's denial of this statement merely states that Ms. Gammon was not responsible for sending out billing statements and did not know what the agency charged on its bills.  That is non-responsive to whether Ms. Gammon was required to fill out the insurance form and authorization form and keep a detailed account of her interactions with clients.  The Court recounts Ms. Gammon's fact as the non-moving party.

During her employment at Crisis & Counseling, Ms. Gammon complained about certain Crisis & Counseling billing practices. Crisis & Counseling required workers to distinguish time spent performing various tasks with clients. PSAMF ¶ 14; DRPSAMF ¶ 14. For example, workers were required to distinguish between time spent assessing clients and merely transporting clients. PSAMF ¶ 15; DRPSAMF ¶ 15.[9] Ms. Gammon thought that Maine regulations required travel time to be billed at $10 per hour and assessment time to be billed at $200 per hour. PSAMF ¶ 16. In 2004, Crisis & Counseling management began to pressure her to charge client transportation at the higher assessment rate. PSAMF ¶ 17. Ms. Gammon believed billing travel time as assessment time amounted to fraud. PSAMF ¶ 18. She began to complain to management that the practice was illegal, first to her supervisor, Priscilla Hall, and then to Triage Manager, Tara Karczewski,[10] her immediate supervisor, Don Williams, and her team leader, Christy Labonte. PSAMF ¶¶ 19-20, 22, 25. Ms. Gammon went online at work and found websites she thought confirmed the illegality of the practice. PSAMF ¶ 21. She showed that information to Mr. Williams. PSAMF ¶ 23. Ms. Gammon made complaints about billing for travel time up to within weeks of her termination. PSAMF ¶ 25.

Ms. Gammon was also required to write assessments for billing purposes even when clients refused assessments. PSAMF ¶ 26. She thought this too

[9] Crisis & Counseling's denial is non-responsive.
[10] Ms. Karczewski is referred to as Tara Karczewski and Tara Karczewski-Mitchell in the record. For consistency, the Court refers to her as Tara Karczewski or Ms. Karczewski throughout this Order.

amounted to fraud.  PSAMF ¶ 27[11]  She complained to Ms. Karczewski and Mr.

Williams about this practice in the last year to six months of her employment.

PSAMF ¶¶ 28-29.  Ms. Gammon also complained about Crisis & Counseling

charging for crisis follow-up when no crisis follow-up occurred.  PSAMF ¶ 32.  Mr.

Williams told her that management did not want to hear the complaints and said,

"I'd drop it if I was you.  That's being perceived as negative."  PSAMF ¶ 31.

Ms. Gammon further complained about perceived safety concerns at Crisis &

Counseling.  PSAMF ¶ 33.  She thought that Crisis & Counseling was not following

the management protocols it had put in place to keep workers safe.  PSAMF ¶ 34.

Ms. Gammon also complained to Ms. Karczewski that safety issues listed in Green

Sheets were ignored.  PSAMF ¶¶ 37-38.  Crisis & Counseling had a flashing light

outside of its office that could be used to warn individuals of potentially dangerous

situations in the office.  PSAMF ¶ 39; DRPSAMF ¶ 39.  Ms. Gammon complained to

Mr. Williams within the last six months of her employment that Crisis &

Counseling failed to follow the flashing light safety practice.  PSAMF ¶¶ 40-41.  Mr.

Williams responded that management did not want to hear about such complaints.

PSAMF ¶¶ 42-43.  Lastly, Ms. Gammon complained to Mr. Williams and Ms. Hall

about being required to do assessments in bad weather when she believed the roads

---

[11] Crisis & Counseling requests the Court strike this statement because it says Ms. Gammon
admitted she did not have any understanding that any billing practices were illegal or otherwise
amounted to fraud.  However, Crisis & Counseling's citations to the record do not support that she
lacked such understanding.  Ms. Gammon admitted that she did not know what was on the final
bills that went out to clients.  *Gammon Dep.* 181:4-12.  However, she also testified that she was
responsible for preparing billing statements.  *Id.* at 81:16-82:18.  It was not unreasonable for Ms.
Gammon to infer a relationship between the Crisis & Counseling billing statements she was
required to fill out and the Crisis & Counseling bills.

were dangerous. PSAMF ¶¶ 44-46. Ms. Gammon made her complaints about billing and safety issues at monthly group supervision meetings up to the time of her termination. PSAMF ¶ 47.

Every year from 2001 to 2006, Ms. Gammon's evaluations counseled her to improve in one or more of the following areas: teamwork, presentation, manner of expressing her opinions, interpersonal relationships with co-workers, and attitude. DSMF ¶ 15; PRDSMF ¶ 15.[12] Also, Ms. Gammon failed to meet attendance standards during her employment. DSMF ¶ 20; PRDSMF ¶ 20.[13] However, Mr. Williams had no issues with the way Ms. Gammon assessed her patients or clients or with her clinical work. PSAMF ¶ 12. He "thought she was an excellent worker." PSAMF ¶ 12.

In June 2007, Ms. Gammon printed from work computers a newspaper article involving a couple who went out to dinner and were violently hijacked. DSMF ¶ 21; PRDSMF ¶ 21. She distributed the article among triage workers and discussed the events in the article at work. DSMF ¶ 21; PRDSMF ¶ 21. Later that month, Ms. Gammon was involved in a confrontation with a co-worker. DSMF ¶ 22; PRDSMF ¶ 22. The co-worker got angry and yelled at Ms. Gammon who "just stepped back as

---

[12] Ms. Gammon generally denies this statement but fails to cite anything in the record to support the denial other than her affidavit, which merely reiterates her general denial. Ms. Gammon cites the "Loranger Aff.", but there is no "Loranger Aff." in the record. District of Maine Local Rule 56(f) provides that "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. . . . The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. ME. LOC. R. 56(f). Because of her failure to cite to the record, Ms. Gammon did not adequately controvert the statement, and the Court treats the fact as admitted.

[13] Ms. Gammon's denial fails to cite the record. She again cites "Loranger Aff.," which is not in the record. For the reasons stated in the previous footnote, the Court treats this fact as admitted.

she hadn't said anything" to the co-worker. PSAMF ¶ 59.[14] The co-worker later complained about Ms. Gammon to human resources. DSMF ¶ 22; PRDSMF ¶ 22. Esther Tuttle, the Director of Human Resources and Scott Moore, the then-Clinical Supervisor, spoke with Ms. Gammon about the co-worker's complaint. DSMF ¶ 23; PRDSMF ¶ 23. Ms. Gammon told them that she felt like she wanted to "rip [the co-worker's] face off" when he was "calling [her] family derogatory names." DSMF ¶ 23; PRDSMF ¶ 23.

During a regularly scheduled supervision meeting on June 12, 2007, Ms. Gammon's supervisor, Donald Williams, explained to Ms. Gammon that she would be placed on a corrective action plan and probation. DSMF ¶ 26; PRDSMF ¶ 26. Ms. Gammon disagreed with the conditions of the probation and objected to the corrective action plan. DSMF ¶ 27; PRDSMF ¶ 27. She testified that the conditions of the probation prohibited her from asking questions or making complaints about billing, client care, or safety. PRDSMF ¶ 27. Ms. Gammon was given no information about what she had done wrong. PSAMF ¶ 68. After leaving work that day, she never returned to work at Crisis & Counseling. DSMF ¶ 30; PRDSMF ¶ 30.

During a phone call the next day, Mr. Williams told Ms. Gammon that she was being put on the corrective action plan because of her alleged negativity.

---

[14] Crisis & Counseling denies Ms. Gammon's characterization of the confrontation. Given the Court's obligation to view all facts in the light most favorable to Ms. Gammon for the purposes of this motion, the Court accepts Ms. Gammon's characterization of the incident.

PSAMF ¶ 71; DRPSAMF ¶ 71.[15] According to Ms. Gammon, he also told her that the action plan was off the table, that management wanted her gone, that she was terminated, and that the company would be offering her a severance package. PSAMF ¶ 70; PSAMF ¶ 72. Ms. Gammon told Mr. Williams that she would not agree to the severance package because she felt she was targeted for her complaints about safety. PSAMF ¶ 74.

On June 18, 2007, Ms. Gammon met with Mr. Moore and Ms. Karczewski. DSMF ¶ 32; PRDSMF ¶ 32; PSAMF ¶ 75; DRPSAMF ¶ 75.[16] At the meeting, Mr. Moore offered her a severance package and told her she had a couple of days to decide whether to take it. PSAMF ¶ 76. Ms. Gammon asked why she was being fired, and Mr. Moore refused to give her an answer. *Id.*

Sandy Rudman called Ms. Gammon on June 18, 2007. PSAMF ¶ 86; DRPSAMF ¶ 86.[17] Ms. Rudman continued to offer Ms. Gammon the severance package and told Ms. Gammon that it was up to her whether the record would reflect that she had resigned or been terminated. PSAMF ¶ 86. In response, Ms. Gammon asked if she could have her job back, to which Ms. Rudman said no.

---

[15] Crisis & Counseling's denial is non-responsive.

[16] The parties dispute the purpose of this meeting. Ms. Gammon said she thought the purpose was for Mr. Moore and Ms. Karczewski to tell her why she was being terminated, PSAMF ¶ 75. and Crisis & Counseling said the meeting was held to determine whether Ms. Gammon intended to return to work since she had not returned since June 12, DSMF ¶ 32.

[17] Crisis & Counseling denies this statement, stating that "Plaintiff's telephone call with Sandra Rudman took place on June 20, 2007, not June 18, 2007. DRPSAMF ¶ 86. However, Crisis & Counseling's own letter, which it attached in the record, refers to a telephone call among Sandy Rudman, Scott Moore, and Ms. Gammon on June 18, 2007. *Aff. of Sandy Rudman* at Attach 3 (Docket # 30) (*June 27 Letter*). Furthermore, Crisis & Counseling's counsel questioned Ms. Gammon at her deposition about a June 18, 2007 phone call with Ms. Rudman. *Gammon Dep.* 151:23-25. Assuming that the same phone call is involved, it is contradictory for Crisis & Counseling to refer to the phone call to make one point and deny it took place to refute another.

PSAMF ¶ 87. At that point, Ms. Gammon told Ms. Rudman that the record needed to reflect that Crisis & Counseling had terminated Ms. Gammon. PSAMF ¶ 87.

On June 20, 2007, Sandy Rudman, the Director of Operations, with Ms. Karczewski and Mr. Moore present, again called Ms. Gammon. DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶ 77; DRPSAMF ¶ 77. The parties again reviewed the severance package. PSAMF ¶ 77; DRPSAMF ¶ 77. Ms. Gammon admitted to Ms. Rudman that she had told the co-worker with whom she had had a confrontation: "He was lucky I did not rip his face off." DSMF ¶ 35; PRDSMF ¶ 35.[18] Ms. Gammon reiterated her understanding that she had been terminated and asked for the reasons for her termination. PRDSMF ¶ 35. Ms. Gammon also requested her employment record. PSAMF ¶ 78.

On June 27, 2007, Ms. Tuttle sent a letter to Ms. Gammon informing her that her employment was terminated effective June 20, 2007, because she had failed to indicate whether she wished to resign after her June 18, 2007, phone conversation with Sandy Rudman and Scott Moore. DSMF ¶ 36; *June 27 Letter*.[19]

### D. Crisis & Counseling's Contentions

Crisis & Counseling argues that to establish a prima facie case under the MWPA, Ms. Gammon must show that "(1) she engaged in activity protected by the MWPA; (2) she was the subject of an adverse employment action; and (3) there was

---

[18] Ms. Gammon does not directly address this statement in her partial denial and partial admission of DSMF ¶ 35. However, she admitted in her deposition testimony that she made that statement, so she cannot plausibly deny doing so now.

[19] Ms. Gammon denies that Crisis & Counseling was forced to assume that Ms. Gammon had resigned her employment because she had not returned to work. She does not deny that she received the letter.

a causal link between the protected activity and the adverse employment action." *Def.'s Mot.* at 9.

### 1. Protected Activity

Crisis & Counseling argues that Ms. Gammon has failed to establish that she engaged in protected activity. *Id.* It contends that, for Ms. Gammon to prove that she engaged in protected activity under the MWPA, she must prove:

> (1) she acted in "good faith"; (2) she made an oral or written report; (3) the report was made to her employer or a public body; (4) she reported what she had "reasonable cause" to believe was either (a) "a violation of the law or rule adopted by the laws of this State, a political subdivision of this State or the United States" or (b) a condition or practice that would put at risk her own health or safety or that of another person; and (5) she either made a prior report to her employer and allowed her employer a reasonable opportunity to correct the violation, condition, or practice, or she had a specific reason to believe that such a report would not result in prompt correction of the violation.

*Id.* at 9-10 (citing *Tripp v. Cole*, 425 F.3d 5, 8 (1st Cir. 2005); *Higgins v New Balance Shoe, Inc.*, 194 F.3d 252, 261 (1st Cir. 1999); and 26 M.R.S. § 833(1)(A) and (B)). Crisis & Counseling argues that Ms. Gammon cannot prove she engaged in protected activity because there are no facts to suggest that she "had a reasonable basis to believe that Crisis & Counseling was engaging in conduct that was illegal or created a risk to health and safety," *id.* at 10, and because she did not act in good faith. *Id.* at 16.

Turning first to the "reasonable cause to believe" element, Crisis & Counseling asserts that Ms. Gammon had no reasonable cause to believe that a violation of law occurred in connection with Crisis & Counseling's billing practices.

*Id.* Citing *Tripp* and *Testa v. Town of Madison*, Docket No. 04-185-B-W, 2005 U.S. Dist. LEXIS 44531 (D. Me. September 26, 2005), Crisis & Counseling argues that to satisfy the reasonable cause element, a plaintiff must be able to point to specific behavior that violates a specific law. *Id.* at 10-11. It argues that Ms. Gammon "cannot point to any specific billing practice or other activity that she reported or complained of that amounted to any known violation of any existing law or billing regulation." *Id.* at 11. It further argues that Ms. Gammon could not have had a reasonable basis because she was not ultimately responsible for the bills sent out to clients and did not know what was billed. *Id.* It contends that Ms. Gammon merely claims that she questioned and sought clarification regarding billing, which does not amount to "a report involving specific conduct which would give rise to a legitimate and legally recognized violation in the mind of a reasonable person." *Id.* at 12.

Crisis & Counseling cites its statement of facts to support its assertion that Ms. Gammon lacked a reasonable basis. *Id.* at 13. It argues that Ms. Gammon admitted she was never instructed to bill for assessment time when she was merely transporting a client, admitted that she understood that clients could be assessed and involuntarily committed when they did not want or request services, and "knew that it was not an illegal practice to perform such services." *Id.*

Crisis & Counseling also argues that Ms. Gammon did not have a reasonable basis to believe that Crisis & Counseling was engaging in conduct that created a risk to health and safety. *Id.* at 14. First, it contends that Ms. Gammon never

complained about the failure to follow Green Sheets. Second it contends that "even if she made such a safety complaint, no reasonable person would have believed that Crisis & Counseling's practices led to any safety risks which were not an inherent part of [Ms.] Gammon's job." *Id.* Crisis & Counseling argues that Ms. Gammon's claim that ignoring information in Green Sheets created a safety risk reflects a "fundamental misunderstanding of the policy and the process of determining how an assessment should occur." *Id.* It contends that Green Sheets merely serve as guidelines when working with a client. *Id.* at 15. It characterizes Green Sheets as one of several tools available "to clinically assess how the client should be handled." *Id.* Crisis & Counseling argues that "no reasonable person would have believed that a case-by-case determination as to how to best assess a client in crisis would have created an untenable safety risk." *Id.*

Crisis & Counseling also argues that Ms. Gammon did not engage in protected activity because she cannot establish that she acted in good faith or that she made a report or complaint. *Id.* at 16. Crisis & Counseling states that "[c]ourts recognize a distinction between 'blowing the whistle' and complaining about one's job." *Id.* at 16 (citing *Horton v. Dep't. of Navy*, 66 F.3d 279, 282 (Fed. Cir. 1995); *Willis v. Dep't. of Agric.*, 141 F.3d 1139, 1143 (Fed. Cir. 1998); and *Montgomery v. E. Corr. Inst.*, 835 A.2d 169, 180 (Md. App. Ct. 2003)). It argues that the good faith requirement focuses on the reporter's purpose in making the report; the purpose must be to expose a wrongdoing for the benefit of the public or some other third party. *Id.* at 16-17. It contends that "complaints about practices that were purely

internal in nature and not related to the purposes of the whistleblower provisions of the law could not be the basis of an objectively reasonable complaint." *Id.* (citing *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009)). Crisis & Counseling says that Ms. Gammon's complaints "at most . . . raised issues regarding Crisis & Counseling's *purely internal practices*, and not any concerns regarding safety or illegal activities that were outside the scope of the agency's regular practices." *Id.* (emphasis in original). It characterizes her complaints as simply griping about a difficult profession, "akin to a firefighter who complains that entering a burning building is unsafe." *Id.* at 17-18. Furthermore, Crisis & Counseling notes that Ms. Gammon failed to use the agency's Grievance Policy to make her billing and safety complaints even though she was aware the policy existed and had used it with satisfactory results in the past. *Id.* at 18-19.

### 2. Adverse Employment Action

Crisis & Counseling also argues that Ms. Gammon cannot establish that she was subject to an adverse employment action. *Id.* at 19. It asserts that Ms. Gammon stormed out of work and refused to return after meeting with her supervisors about entering into a corrective action plan, "thereby effectively quitting her job." *Id.* Crisis & Counseling argues that as a matter of law, an employer's attempt to counsel an employee under a corrective action plan does not amount to an adverse employment action. *Id.* at 19-20. According to Crisis & Counseling's characterization of the events, Ms. Gammon quit her employment at Crisis & Counseling in response to Crisis & Counseling's efforts "to work with and counsel

24

[Ms.] Gammon regarding her job performance." *Id.* at 20. When Ms. Gammon refused to return to work or respond to Crisis & Counseling's efforts to ascertain her status, "the agency sent a letter to [Ms.] Gammon indicating that the agency was forced to assume that she had resigned her employment." *Id.* Crisis & Counseling argues that "an employee's subjective 'feeling' that his job is in jeopardy because the employer 'gave him hell' is not enough to demonstrate an adverse employment action." *Id.* at 21 (quoting *Anderson v. Theriault Tree Harvesting, Inc.*, Civ. No. 08-330 B-W, 2010 U.S. Dist. LEXIS 4538, at *22 (D. Me. Jan. 20, 2010)).

### 3. Constructive Discharge

Crisis & Counseling next argues that Ms. Gammon cannot establish that she was constructively discharged. *Id.* at 21-22. It contends that constructive discharge "presents a high evidentiary hurdle" for a plaintiff and requires an objective showing "that she was subjected to arduous and hostile working conditions that were so intolerable that a reasonable person under her circumstances would have felt compelled to resign." *Id.* at 21 (citing *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir. 1997); *Anderson,* 2010 U.S. Dist. LEXIS 4538, at *23-24; *King v. Bangor Federal Credit Union*, 611 A.2d 80, 82 (Me. 1992)).

Crisis & Counseling argues that Ms. Gammon has offered no evidence to meet this standard. According to Crisis & Counseling, at most "she was told 'not to ask questions' and was placed on a corrective action plan." *Id.* at 22. Crisis & Counseling characterizes her problems at the agency as subjective dissatisfaction with a difficult job, which does not amount to constructive discharge. *Id.* It further

argues that her constructive discharge claim is undercut by the "significant periods of time after her alleged protected activity" that she stayed on the job. *Id.*

### 4. Causal Link

Finally, Crisis & Counseling contends that Ms. Gammon cannot establish any causal link between her alleged protected activity and an adverse employment action. *Id.* It says that to satisfy this element, Ms. Gammon must demonstrate some discriminatory animus on the part of Crisis & Counseling or a temporal relationship between the protected activity and the adverse employment action. *Id.* at 22-23. It asserts that Ms. Gammon has proffered no evidence of discriminatory animus. *Id.* at 23. It further argues that Ms. Gammon cannot show any temporal relationship. Observing that her alleged protected activity began years before the alleged adverse employment action, it argues that courts have found spans as short as three months too long to establish a causal connection. *Id.* at 23-24 (citing *Calero-Cerezo v. United States Dep't. of Justice*, 355 F.3d 6, 25 (1st Cir. 2004)). Crisis & Counseling further argues that even if the temporal proximity were close enough, the larger picture of Ms. Gammon's repeated workplace transgressions "undercuts any claim of causation." *Id.* at 23 (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003)).

### E. Ms. Gammon's Response

Ms. Gammon agrees that to prove a violation of the MWPA, she must prove the three elements cited by Crisis & Counseling. *Pl.'s Resp.* at 10. However, she

argues that triable issues of fact exist as to each element, thus precluding summary judgment.

### 1.    Protected Activity

Ms. Gammon argues that a triable issue exists as to whether she had reasonable cause to believe Crisis & Counseling's billing practices violated a rule or law.  *Id.*  She first notes that she disputes the facts cited by Crisis & Counseling as relevant to reasonable cause.  *Id.* at 11.  She further contends that her additional statement of material facts "contain[s] evidence from which a reasonable jury may infer that [she] had reasonable cause to believe that the billing practices were a violation of the licensing agreements with the State, illegal, and/or fraudulent."  *Id.*

Ms. Gammon similarly argues that a triable issue exists as to whether she had reasonable cause to believe a condition or practice existed that would put at risk her health or safety or that of another.  *Id.*  Again, she notes that she disputes the facts cited by Crisis & Counseling as relevant to this issue.  *Id.*  Furthermore, she argues that, contrary to Crisis & Counseling's position, she has provided evidence that she complained about the failure to follow Green Sheets and other safety issues.  *Id.*  She contends that her supervisor, Mr. Williams, candidly admitted that she complained.  *Id.* at 11-12.  She asserts that such complaints fall within the plain language of the MWPA.  *Id.* at 12.

Ms. Gammon maintains that there is a triable issue as to whether she acted in good faith in making her complaints.  *Id.*  She contends that she has presented evidence that, she had not merely complained about her job, but had "complained to

all levels of management about [Crisis & Counseling]'s policy of overbilling and failure to adhere to safety practices thus increasing the threat to its workers." *Id.*

### 2. Adverse Employment Action

Turning to the second element of a MWPA action, Ms. Gammon notes simply that Crisis & Counseling conceded that termination is an adverse employment action, that whether she was terminated is a fact in dispute, and that she has presented evidence that she was in fact terminated. *Id.* at 13.

### 3. Causal Link

Ms. Gammon argues that Crisis & Counseling "ignores the conflicting evidence which clearly establishes a direct link between [her] protected activity and the adverse action." *Id.* She asserts that she presented evidence that she complained about billing and safety issues "up to her termination." *Id.* She further asserts that these complaints were met with accusations that she was "being 'negative' and a 'troublemaker'" and that she was warned to stop making complaints. *Id.* She argues Crisis & Counseling's negative reaction to her complaints is further reflected in its admission that team leader meetings were dominated by discussions about her negative comments and its decision to put her on a corrective action plan "to address her inappropriate comments and negative behavior." *Id.* at 14. Ms. Gammon characterizes the corrective action plan as retaliation for her complaints. *Id.* She argues that the terms of the corrective action plan provide further evidence of a causal link because they put her on indefinite probation and prohibited her from engaging in conversations with others

and bringing complaints to team leaders. *Id.* She says that when she questioned the reasons for the probation, the corrective action plan was taken off the table and she was fired. *Id.*

Ms. Gammon says that the causal link is strengthened when Crisis & Counseling's proffered reasons for the probation and corrective action plan are examined. She argues that she did nothing wrong in either of the June 2007 incidents that led to the proposed plan. *Id.* First, she asserts that there was nothing "inappropriate or unusual" about her printing a news article and sharing it with other employees. *Id.* Second, she argues that there is no evidence that she instigated or did anything wrong in connection with the June 2007 confrontation with a co-worker. *Id.* at 15. Third, she disputes that she engaged in the workplace transgressions cited by Crisis & Counseling. *Id.* She argues that Crisis & Counseling proffers these reasons as a pretext for its retaliatory animus. *Id.* at 15-17.

## F.     Crisis & Counseling's Reply

Crisis & Counseling reiterates its assertion that Ms. Gammon did not have a reasonable cause to make her complaints. *Def.'s Reply* at 4. It says that she "cannot identify a single specific complaint which she *reasonably believed was a violation of the law or an unsafe condition or practice.*" *Id.* (emphasis in reply). It argues that Ms. Gammon's attempts to dispute the material facts it presented are "cursory" and "not serious" and that Ms. Gammon fails to respond to the legal

contentions in its motion for summary judgment, specifically, its analyses of the *Tripp* and *Testa* cases. *Id.*

Crisis & Counseling also contends that Ms. Gammon "cannot satisfy her burden of proving that she acted 'in good faith' by complaining about practices or conditions that Crisis & Counseling could actually address and correct, as opposed to way[s] the agency conducted its business." *Id.* at 5. It again says that Ms. Gammon failed to dispute or address the cases it cited on this point in its motion for summary judgment. *Id.* It asserts that those cases are "dispositive and show that Gammon did not engage in protected whistleblower [activity] by complaining about the purely internal aspects of her own job or the agency's business." *Id.*

On the causation issue, Crisis & Counseling restates its position that "there simply are not facts to support the standard imposed by courts to show a causal nexus between any such activity and the hypothetical termination of Gammon's employment." *Id.* at 6. After initially stating that "a corrective action plan is *not* an adverse employment action as a matter of law," it asserts that there is no evidence that the proposed corrective action plan had anything to do with her alleged complaints. *Id.* at 6-7. Instead, it says that "the purpose of the corrective action plan was to address Gammon's disruptive behavior during the course of dealing with clients in crisis . . . ." *Id.* at 7.

Finally, Crisis & Counseling argues that Ms. Gammon cannot show that its actions were pretextual. It characterizes her reference to the June 2007 confrontation as a "straw man," as it was "only a single incident in a long line of

concerns regarding [Ms.] Gammon's negative and disruptive behavior." *Id.* It says that Crisis & Counseling had been planning a corrective action plan for her before that incident. *Id.* It further argues that Ms. Gammon cannot establish temporal proximity between protected activity and an adverse action because she "cannot identify a single specific protected complaint that she made within any temporal proximity of her alleged termination." *Id.* Finally, it argues that, even if she could establish such temporal proximity, that "does not establish causation when, as here 'the larger picture undercuts any claim of causation.'" *Id.* (quoting *CompUSA, Inc.*, 352 F.3d at 478).

## II.     DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).

### B. Maine Whistleblower Protection Act

To prevail on her MWPA claim, Ms. Gammon must prove three elements: "(1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and, (3) there was a causal link between the protected activity and the adverse employment action." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053.

The MWPA analysis is guided by federal case law construing analogous statutes. *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶12, 915 A.2d 400, 404; *see also Maine Human Rights Comm'n. v. City of Auburn*, 408 A.2d 1253, 1261 ("As we have previously held, the Maine legislature by adopting provisions that generally track the federal antidiscrimination statutes intended the courts to look to the federal case law to provide significant guidance in the construction of our statute." (internal quotation marks omitted)). Specifically, the statutory scheme follows "the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 19, 909 A.2d 629, 636. Pursuant to that analysis, if the plaintiff can establish a temporal relationship between the protected activity and the adverse employment action, "the employer, then, will be required to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." *Id.* (citing *DiCentes v. Michaud*, 1998 ME 227 ¶ 14, 719 A.2d 509, 514). "The final burden to prove the existence of the causal nexus remains with the plaintiff." *Id.* (citing *DiCentes*, ¶ 16, 719 A.2d at 515). "[A] plaintiff can meet [this]

final burden and survive a defense motion for a summary judgment by establishing a factual dispute as to whether a causal connection exists between the report protected by the [M]WPA and the adverse employment action." *Stanley v. Hancock Cty. Com'rs.*, 2004 ME 157, ¶ 24, 864 A.2d 169, 177.

Here, the parties' dispute comes down to whether Ms. Gammon has presented sufficient facts to establish each of the three elements.

## C. Analysis

### 1. Protected Activity

The relevant portion of the MWPA defines protected activity:

> A. The employee, acting in good faith, . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States; [or]

> B. The employee acting in good faith, . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

26 M.R.S. § 833(1). Ms. Gammon alleges that her complaints about billing practices were protected activity under subpart (A) and that her complaints about safety were protected activity under subpart (B). Crisis & Counseling argues that Ms. Gammon's complaints lacked the required "good faith" and "reasonable cause to believe" elements.

### a. Good Faith

Crisis & Counseling's argument that Ms. Gammon did not act in good faith boils down to an assertion that her complaints amounted to griping about the

difficulty of her job rather than exposing unsafe and illegal practices for the benefit of other workers and the general public. *See Def.'s Mot.* at 16-19. The law it cites on good faith is generally geared towards an assessment of whether the purported whistleblower made her complaints for the purpose of exposing illegal or unsafe practices. The Court is unaware of a more precise standard.

If it were to believe Ms. Gammon's testimony, a reasonable jury could find that Ms. Gammon made her complaints to expose illegal or unsafe practices. With regards to billing, she complained that she thought it was unjust and fraudulent for Crisis & Counseling to charge for work that was not being done. A reasonable jury could construe these complaints as an effort to protect clients or reimbursers from illegal billing practices.

With regards to safety, Ms. Gammon complained that safety concerns listed in clients' Green Sheets were ignored, that crisis workers were required to travel in unsafe conditions, and that the flashing light protocol to warn employees of potential emergencies at the office was disregarded.[20] This is at bottom a factual dispute. A jury could reasonably find that Ms. Gammon's complaints represented an attempt to expose Crisis & Counseling's unwillingness to fully implement reasonable safety measures, and such a finding would square her complaints with the purposes of the MWPA and vitiate the argument that they were made in bad faith.

---

[20] Although Crisis & Counseling characterizes these complaints as "akin to a firefighter who complains that entering a burning building is unsafe," *Def.'s Mot.* at 18, they could also be characterized as akin to a firefighter complaining about being forced to enter a burning building without a helmet and hose.

### b.    Reasonable Cause

Crisis & Counseling relies on *Tripp* and *Testa* to argue that Ms. Gammon did not have reasonable cause to believe that a violation of law occurred in connection with Crisis & Counseling's billing practices.  *See Def.'s Mot* at 10-14.

In *Tripp*, a plaintiff police officer complained that a town manager violated a specific statute regarding obstruction of government administration.  425 F.3d at 9-10.  The alleged violation was the town manager's request that the police officer ask the district attorney to drop a criminal charge against a local citizen.  *Id.* at 7.  The First Circuit upheld the trial court's finding that the plaintiff did not have reasonable cause to believe the town manager's request violated the statute. It noted that "in virtually all of the reported cases under [the statute] and its predecessor common law doctrine, the defendant had attempted to prevent a law enforcement officer from effecting a search or arrest." *Id.* at 9-10.  It stated that "in over 100 years of reported Maine cases," no one had been found to be the victim of "the particular form of obstructing government administration" complained of by the plaintiff.  *Id.* at 10.

In *Testa*, a plaintiff complained about activities relating to the inner-workings of a municipal government.  *See Testa*, Docket No. 04-185-B-W, 2005 U.S. Dist. LEXIS 44531, at *26-28 (D. Me. September 26, 2005).  The District Court found that the plaintiff failed to present any evidence of a violation of law and had no reason to believe that one had taken place.  *Id.* at 28-36.  Instead, the Court

concluded that the plaintiff's complaints reflected her own personal dissatisfaction with her job. *Id.*

*Tripp* and *Testa* are both inapposite to the facts in this case when viewed in the light most favorable to Ms. Gammon. In both cases, the plaintiffs tried to apply specific laws to conduct they disagreed with. However, they were unable to explain how the law applied to the conduct or why it was reasonable to consider the conduct a violation of law.

By contrast, Ms. Gammon complained about conduct that is unjust on its face. Ms. Gammon says she complained that Crisis & Counseling was billing clients for assessments that had not been made. To bill for services that were never provided would be manifestly illegal. *See* 17-A M.R.S. § 354 (criminalizing "theft by deception"). Individuals need not cite specific statutes to know that it would be improper for a service business not to perform the service but to charge the client as if it had been done. Indeed, to be considered protected activity, the MWPA does not require that the "reported condition, activity, or practice actually *be* unsafe or illegal; . . . an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to this employer in good faith." *Higgins*, 194 F.3d at 261-62 (emphasis in original). Therefore, if a jury believes Ms. Gammon's testimony that she was required to record assessment time on billing statements when no assessment took place, it could find that she had reasonable cause to believe that a violation of law was taking place.

Crisis & Counseling also argues that Ms. Gammon could not have had a reasonable basis because she admitted she was not responsible for drafting final bills or sending them out to clients. This argument is unavailing. Ms. Gammon testified that she was responsible for preparing billing statements and that she received instructions on how to fill out those billing statements. *Gammon Dep.* at 81:11-82:18. It is reasonable for an employee to believe that a company's instructions to its employees regarding billing statements are related to the company's ultimate billing practices.

Turning to Ms. Gammon's safety complaints, she testified that she complained about specific issues at Crisis & Counseling. She testified that safety protocols adopted by management were not followed, that safety concerns listed in the Green Sheets regarding specific clients were ignored, and that crisis workers were required to drive to meet with clients in dangerous weather conditions. Crisis & Counseling's only argument is that Ms. Gammon misunderstands the Green Sheets. It says that they were only guidelines to help workers conduct a case-by-case analysis for proper client assessment. Crisis & Counseling's decision not to treat the warnings in its Green Sheets as evidence of danger does not mean that Ms. Gammon lacked a reasonable basis to believe that she or her co-workers were put at risk when the warnings were ignored. Furthermore, other than disputing that Ms. Gammon made any other safety complaints, Crisis & Counseling does not address her other alleged safety concerns. Ms. Gammon's assertions to the contrary are supported in the record and thus preclude summary judgment for Crisis &

Counseling. Given Ms. Gammon's specific safety concerns, a jury could find that she had a reasonable cause to believe conditions or practices existed at Crisis & Counseling that would put at risk her and her co-workers' health or safety.

### 2. Adverse Employment Action

There is a genuine issue of fact as to whether Ms. Gammon was the subject of an adverse employment action. Job termination is an adverse employment action under the MWPA. *LePage*, 2006 ME 130, ¶ 20, A.2d at 636. Here, the parties present a genuine dispute as to whether Ms. Gammon was terminated.[21] Crisis & Counseling argues that Ms. Gammon quit her job because she left work with no intention of returning after being told about a proposed corrective action plan. Ms. Gammon maintains the corrective action plan was taken off the table and she was fired before she could fully discuss it. Both narratives are supported in the record, and in the face of this genuine issue of material fact, the Court cannot find as a matter of law that Ms. Gammon was not subject to an adverse employment action.

### 3. Causal Link

Finally, there are genuine issues of fact as to whether there is a causal link between the alleged protected activity and the alleged adverse employment action. "Proof of conduct protected by the WPA . . . followed in close proximity by an adverse employment action, gives rise to an inference that a causal connection is established." *DiCentes*, 1998 ME 227 ¶ 16, 719 A.2d 509, 515. The First Circuit has

---

[21] Ms. Gammon does not assert that she was constructively discharged or that Crisis & Counseling's attempt to place her on probation and a corrective action plan amounted to an adverse employment action.

held one month is close enough proximity to raise that inference. *Calero-Cerezo*, 355 F.3d at 25. Ms. Gammon has presented evidence that she engaged in protected activity in monthly meetings up to the time of her termination. She has thus made out a prima facie case on causation.

Although Crisis & Counseling maintains that it never subjected Ms. Gammon to an adverse employment action, it anticipates the next step of the *McDonnell Douglas* framework by proffering non-retaliatory reasons for terminating Ms. Gammon. It asserts that even if it "had decided to terminate [Ms.] Gammon . . . such a decision was completely unrelated to any protected activity." *Def.'s Mot.* at 24. In support, it cites negative comments in her evaluations from 2001 through 2006, her attendance problems, and other alleged "workplace transgressions." *Id.* at 23-24.

Ms. Gammon responds that those reasons are a mere pretext for Crisis & Counseling's retaliatory decision. She notes that Mr. Williams repeatedly told her that her complaints were perceived as negative and that her negativity and inappropriate comments were cited as reasons to put her on probation and a corrective action plan. She further notes that the terms of her corrective action plan prohibited her from making further complaints or asking further questions. While admitting there were negative comments in her evaluations, she maintains that her performance at work was consistently lauded. Finally, Ms. Gammon alleges that Crisis & Counseling attempts to justify its action against her by distorting the facts surrounding the two June 2007 incidents.

Based on this record, Crisis and Counseling has satisfied its obligation to "produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse action." *LePage*, 2006 ME 130, ¶ 19, 909 A.2d at 636. The burden shifts back to Ms. Gammon to establish "a factual dispute as to whether a causal connection exists between the report protected by the [M]WPA and the adverse employment action." *Stanley*, 2004 ME 157, ¶ 24, 864 A.2d at 177.

The Court is satisfied that Ms. Gammon has established a factual dispute as to whether a causal link exists. The Court is mindful that it should "exercise caution in resolving issues of pretext on summary judgment." *Cookson v. Brewer Sch. Dept.*, 2009 ME 57, ¶ 17. 974 A.2d 276, 282; *see also Billings v. Town of Grafton*, 515 F.3d 39, 56 (1st Cir. 2008) (stating that "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment." (internal quotation marks omitted)). Ms. Gammon need only create a genuine factual dispute as to whether Crisis & Counseling's reasons for taking action against her were pretexts. She may do so by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Cookson*, 2009 ME 57, ¶ 17. 974 A.2d 276, 282 (quoting *Billings*, 515 F.3d at 55-56) (internal quotations omitted). Ms. Gammon's evidence establishes inconsistencies and contradictions in the tone of her evaluations and the events surrounding the June 2007 incidents.

40

She has further alleged that by citing "negativity" as a reason for termination, Crisis & Counseling makes a veiled reference to her complaints. Given the dispute surrounding the facts and motives underlying Crisis & Counseling's actions, resolution of the causation issue is best left for a fact finder. *See Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir. 1990).

### D. Summary

Ellen Gammon has generated genuine issues of material fact regarding each of the three elements of her MWPA claim. Accordingly, summary judgment is inappropriate.

## III. CONCLUSION

The Court DENIES Crisis and Counseling Centers, Inc.'s Motion for Summary Judgment (Docket # 28).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 19th day of January, 2011